20-1352
In re: Synchrony Financial Securities Litigation

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2020

(Argued: November 12, 2020                    Decided: February 16, 2021)

Docket No. 20-1352

_____

IN RE: SYNCHRONY FINANCIAL SECURITIES LITIGATION

STICHTING DEPOSITARY APG DEVELOPED MARKETS EQUITY
POOL, STICHTING DEPOSITARY APG FIXED INCOME CREDITS
POOL,

*Plaintiffs-Appellants*,

v.                                                                    20-1352-cv

SYNCHRONY FINANCIAL, MARGARET M. KEANE, BRIAN D.
DOUBLES, THOMAS M. QUINDLEN, DAVID MELITO, PAGET
ALVES, ARTHUR COVIELLO, JR., WILLIAM GRAYLIN, ROY
GUTHRIE, RICHARD HARTNACK, JEFFREY NAYLOR, LAUREL
RICHIE, OLYMPIA SNOWE, BARCLAYS CAPITAL INC.,
MIZUHO SECURITIES USA LLC, MORGAN STANLEY & CO. LLC,
TD SECURITIES (USA) LLC, BLAYLOCK VAN, LLC, CASTLEOAK
SECURITIES, L.P., MISCHLER FINANCIAL GROUP, INC., R.
SEELAUS & CO., INC., THE WILLIAMS CAPITAL GROUP, L.P.,

*Defendants-Appellees.*

_____

Before: JACOBS, POOLER, and BIANCO, *Circuit Judges*.

Appeal from the judgment of the United States District Court for the District of Connecticut (Victor A. Bolden, *J.*) dismissing plaintiffs' claims alleging violations of certain sections of the Securities Exchange Act of 1934 ("Exchange Act") and the Securities Act of 1933 ("Securities Act"). Plaintiffs allege that Synchrony Financial, many of its corporate officers, and other entities involved in a December 2017 promissory note offering are liable for materially misrepresenting the scope and degree of changes to the company's underwriting practices beginning in mid-2016 and the impact these changes had on its business relationships with retail companies. The district court dismissed the case in its entirety. Plaintiffs-Appellants argue that they plausibly alleged that Defendants-Appellees misrepresented material components of Synchrony Financial's business operations. Defendants-Appellees argue that the district court was correct in concluding that some of the alleged misrepresentations were too vague to be actionable, some statements were not misleading given the total mix of public information, and the Securities Act claims were time-barred.

With one exception, we agree with the district court that, from the face of the amended complaint, many allegations were too vague to constitute material

2

misrepresentations on which a reasonable investor would rely. We also agree that many alleged material misstatements were properly contextualized by the total mix of publicly available information and appropriately dismissed. However, we part ways with the district court with respect to one alleged misstatement, which we find sufficiently specific to survive a motion to dismiss.

Plaintiffs alleged that, in early 2018, a corporate representative of Synchrony Financial publicly stated the company had received no "pushback" from retail partners during negotiations. Because that alleged statement purported to make a factual assertion about events that had already transpired or were currently in progress, it is materially distinct from the other allegations. Moreover, particularized allegations in the amended complaint explain how and why this statement may have been false at the time it was made. Therefore, this set of allegations plausibly alleges an Exchange Act violation.

We AFFIRM in part and REVERSE in part the judgment of the district court and REMAND for further proceedings in accordance with this opinion.

_____

3

SALVATORE J. GRAZIANO, Bernstein Litowitz Berger & Grossmann LLP (Adam H. Wierzbowski, Kate W. Aufses, Matthew W. Traylor, *on the brief*), New York, NY, *for Plaintiffs-Appellants*.

William H. Narwold, Gregg S. Levin, Motley Rice LLC, Hartford, CT and Mount Pleasant, SC (*on the brief*), *for Plaintiffs-Appellants*.

VICTOR L. HOU, Cleary Gottlieb Steen & Hamilton LLP (Jared Gerber, *on the brief*), New York, NY, *for Defendants-Appellees Synchrony Financial, Margaret M. Keane, Brian D. Doubles, Thomas M. Quindlen, David Melito, Paget Alves, Arthur Coviello, Jr., William Graylin, Roy Guthrie, Richard Hartnack, Jeffrey Naylor, Laurel Richie, and Olympia Snowe.*

James T. Shearin, Pullman & Comley LLC, Bridgeport, CT (*on the brief*), *for Defendants-Appellees Synchrony Financial, Margaret M. Keane, Brian D. Doubles, Thomas M. Quindlen, David Melito, Paget Alves, Arthur Coviello, Jr., William Graylin, Roy Guthrie, Richard Hartnack, Jeffrey Naylor, Laurel Richie, and Olympia Snowe.*

Adam S. Hakki, Daniel C. Lewis, Shearman & Sterling LLP (*on the brief*), New York, NY, *for Defendants-Appellees Barclays Capital Inc., Mizuho Securities USA LLC, Morgan Stanley & Co. LLC, TD Securities (USA) LLC, Blaylock Van, LLC, CastleOak Securities, L.P., Mischler Financial Group, Inc., R. Seelaus & Co., Inc., and The Williams Capital Group, L.P.*

4

POOLER, *Circuit Judge*:

Securities fraud cases are often complex and costly, so the pleading standards for such cases are demanding. However, even securities plaintiffs need not prove their entire case within the confines of the complaint. Equally as important as concerns about facilitating overly burdensome and expensive discovery and litigation are concerns about prematurely dismissing cases where plaintiffs have plausibly alleged with particularity the existence of securities fraud. In applying Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), we must be careful not to mistake heightened pleading standards for impossible ones. Although the district court conducted a sound analysis as to many of the instant allegations before dismissing plaintiffs' case, one set of allegations was materially distinct and should have survived.

The district court properly dismissed several optimistic generalities about Synchrony Financial's ("Synchrony") business operations as inactionable corporate puffery. But some of the plaintiffs' allegations paint a more specific narrative. In relevant part, plaintiffs allege that, in early 2018, Synchrony representatives stated the company had received no "pushback" from its retail partners in the face of certain changes to the company's underwriting standards

and credit portfolio. However, multiple former employees and the *Wall Street Journal* allegedly reported that Synchrony's relationship with its then-largest retail partner, Walmart, was swiftly deteriorating in 2017 because of those changes. Plaintiffs thus plausibly alleged that Synchrony misrepresented facts pertaining to events that had already transpired, in violation of the Exchange Act, and those allegations sufficed to survive a motion to dismiss.

As for the remaining allegations, we affirm their dismissal. Accordingly, we affirm in part and reverse in part, and remand for further proceedings consistent with this opinion.

## BACKGROUND

These facts are taken from plaintiffs' amended complaint and are assumed true at this early stage of the litigation. *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000).

**I.  The Parties**

Plaintiffs-Appellants Stichting Depositary APG Developed Markets Equity Pool and Stichting Depositary APG Fixed Income Credits Pool (collectively, "Stichting") were appointed lead plaintiffs in this putative class action against, inter alia, Synchrony. Stichting is allegedly "one of the largest institutional

investors in the world," App'x at 34, and purchased shares of publicly traded Synchrony stock between October 21, 2016 and November 1, 2018 (the "Class Period"). Stichting also purchased Synchrony 3.95 percent bonds due 2027 (the "Notes") traceable to Synchrony's December 1, 2017 note offering (the "Offering").

Defendant-Appellee Synchrony is a Delaware corporation that operates in the consumer financial services industry. For the relevant period, Margaret M. Keane was Synchrony's Chief Executive Officer ("CEO") and President, Brian D. Doubles was Synchrony's Chief Financial Officer ("CFO") and Executive Vice President ("EVP"), and Thomas M. Quindlen was another EVP and Synchrony's CEO of Retail Cards. All three, along with Synchrony, are defendants to Stichting's Exchange Act claims (collectively, the "Exchange Act Defendants").

Stichting brought its Securities Act claim against Keane, Doubles, and the following additional individuals: David Melito, Synchrony's Senior Vice President ("SVP"), Chief Accounting Officer, ("CAO"), and Controller, and Paget Alves, Arthur Coviello, Jr., William Graylin, Roy Guthrie, Richard Hartnack, Jeffrey Naylor, Laurel Richie, and Olympia Snowe, all members of Synchrony's Board of Directors ("BOD"). Stichting also named several financial institutions as

defendants to the Securities Act claim. They were all allegedly involved with the Offering: Barclays Capital Inc.; Mizuho Securities USA LLC; Morgan Stanley & Co. LLC; TD Securities (USA) LLC; Blaylock Van, LLC; CastleOak Securities, L.P.; Mischler Financial Group, Inc.; R. Seelaus & Co., Inc.; and The Williams Capital Group, L.P. (collectively, the "Securities Act Defendants").

## II. Synchrony's Operations and Alleged Misrepresentations

Synchrony is the largest provider of private label credit cards ("PLCC") in the United States. A PLCC bears the name of a specific retailer (e.g., Sam's Club, Amazon, Lowe's) and can be used only for purchases with that retailer. Synchrony also provides general purpose co-brand credit cards ("Dual Cards"), which bear the brand of a retail partner but can be used as an ordinary credit card at other stores. Consumers that hold PLCCs tend to be a higher credit risk and have lower Fair Isaac Corporation ("FICO") credit scores than consumers who receive Dual Cards.[1] For some time prior to 2016, Synchrony frequently

---

[1] A FICO score predicts how likely a borrower is to timely make loan payments. Typically, the lower an individual's FICO score, the higher that individual's credit risk. Higher FICO scores may result in better interest rates and credit offers. A FICO score depends on data within an individual's credit report, which is collected by three major agencies—Experian, Equifax, and TransUnion. *See* Consumer Financial Protection Bureau, *What is a FICO Score?*,

upgraded consumers from PLCCs to Dual Cards, a strategy called "low and grow." App'x at 36 (internal quotation marks omitted). The strategy refers to Synchrony's practice of gradually upgrading consumers with PLCCs, typically those with lower credit scores, to higher credit lines and then to Dual Cards.

Within the triangle of retailer, Synchrony, and consumers, each actor experiences different incentives and rewards. Synchrony controls the credit criteria, the issuance of credit cards, and owns the underlying accounts. Retailers receive a share of the customers' fees, interest payments, and other charges on the credit accounts, along with increased sales, customer loyalty, and stronger branding and marketing. Consumers who sign up for PLCCs or Dual Cards get instant access to credit, discounts, and loyalty programs.

One of Synchrony's most important retail partners was Walmart. Indeed, Stichting alleges that Walmart was so significant to Synchrony's business that Synchrony maintained an office in Arkansas, near Walmart's headquarters. Walmart draws a significant amount of business from a low-income, subprime-borrower customer base. Subprime borrowers, who have FICO scores of 660 or

---

https://www.consumerfinance.gov/ask-cfpb/what-is-a-fico-score-en-1883/ (last visited Feb. 12, 2021).

9

less, comprised about 25 percent of Synchrony's credit card loans within the Class Period. Walmart encouraged Synchrony to approve more subprime borrowers, which would boost sales to its customer base. Synchrony often generated revenue from this customer base in the form of interest payments and late fees. Between 2011 and 2016, Synchrony allegedly converted a number of Walmart PLCC-holders to Dual Cardholders, pursuant to its "low and grow" strategy.

By 2016, the "low and grow" strategy began to backfire. With converted Dual Cards, riskier borrowers had more freedom to use their cards at stores other than Walmart, resulting in lower-than-expected revenue for Walmart and higher credit portfolio losses for Synchrony. To remedy this, Synchrony subsequently allegedly "drastically tightened its underwriting standards" without disclosing this to its investors. App'x at 43.

Nevertheless, Synchrony representatives continued to publicly maintain that any changes to its underwriting standards were minimal. For example, on December 7, 2016, Doubles said at a financial services conference that Synchrony was "not seeing anything right now" suggesting a need to "change [its] underwriting." App'x at 50. On January 20, 2017, Doubles stated during an

10

earnings call that Synchrony has "maintain[ed] very consistent credit guidelines." App'x at 50. In its Form 10-K filing, published on February 23, 2017, Synchrony maintained that it did "not anticipate making significant changes to [its] underwriting standards." App'x at 50, 77. Doubles reiterated the same at a financial services conference on February 27, 2017. During this time, Synchrony's stock price increased, and Synchrony officers, including Keane and Doubles, allegedly sold large amounts of their personal holdings of Synchrony stock.

On April 28, 2017, Synchrony announced a 14 percent decline in annual net income. It attributed the loss to its poorly performing loan portfolio, citing higher net charge-off rates. It also announced that it expected further charge offs and more than tripled its loan reserves from $423 million to $1.3 billion. During an earnings call on that day, an analyst asked whether Synchrony was "tighten[ing] from a credit perspective." App'x at 53. Doubles responded that Synchrony had not "made what [he] would call significant changes to [its] underwriting model" and any changes were "pretty surgical in nature." App'x at 53. Following this announcement, Synchrony's stock price dropped nearly 16 percent.

Stichting alleges that changes in underwriting standards alienated some of Synchrony's retail partners, including Walmart. Because Synchrony began to

11

issue fewer credit cards to subprime borrowers, fewer Walmart consumers could obtain cards, resulting in lower revenue for Walmart. Walmart representatives allegedly expressed these concerns as early as late 2016, and the relationship between the two companies began to fray. Stichting corroborates this narrative with statements from former Synchrony employees. A former credit sales manager for the Walmart account through November 2018 told Stichting that by 2017, he was aware of complaints from Walmart that Synchrony was not approving enough of its customers. A former analyst in Synchrony's credit and risk function group reported that Walmart responded negatively when Synchrony explained the delinquencies in the loan portfolio would result in lower revenue for Walmart. The analyst departed Synchrony in September 2017 but had observed tension and turbulence at meetings with Walmart by then. A former acquisitions strategy manager said he participated in phone calls with Walmart representatives during which a Synchrony risk manager explained Walmart's approval rates were going to decrease. According to the strategy manager, Walmart "felt that Synchrony did not know what it was doing." App'x at 59. The strategy manager also stated that Keane and Doubles traveled to Arkansas more often in the latter half of 2017 into 2018 and suspected this was

12

due to "alarming feedback from the Walmart client relationship manager that the relationship was doomed." App'x at 61. The strategy manager was nearly certain by late 2017 and early 2018 that Synchrony would lose Walmart as a client.

Stichting also references two *Wall Street Journal* articles, published in July and October 2018, that reported on the deteriorating relationship between Synchrony and Walmart. One article reported that Walmart "balked" at the idea of renewal in fall 2017. App'x at 62. The WSJ also reported that, for the first time, Walmart began soliciting bids from other PLCC issuers by late 2017. Several former employees corroborated this, explaining that it was well known within Synchrony that Walmart had issued bids to at least one of Synchrony's competitors. Despite this, during an earnings call made January 19, 2018, Keane stated, in response to an analyst's inquiry about "pushback" from retail partners on Synchrony underwriting practices, that Synchrony had not gotten "any pushback on credit" and once again characterized any underwriting changes as "modest refinements." App'x at 67-68. But Keane and Doubles continued selling large portions of their personally held Synchrony stock. On an April 20, 2018 earnings call, Doubles reiterated that Synchrony was "well entrenched" with its retail partners. App'x at 69. At two financial services conferences in May and

June 2018, Synchrony executives opined that they "feel good about where [they]'re positioned competitively right now," that "Walmart is a good partner," and that there was "great dialogue going on" with their partners. App'x at 70-71.

On July 26, 2018, media sources began reporting Walmart planned to move its PLLC business to Capital One, ending a 20-year relationship with Synchrony. Synchrony's share prices fell by 10 percent in response. The next day, on an earnings call, Doubles stated Synchrony was unable to negotiate a return that it believed would be sufficient relative to the credit risk of Walmart's consumers. On November 1, 2018, Walmart sued Synchrony, alleging that Synchrony breached the parties' contract and the implied covenant of good faith and fair dealing. Public portions of the complaint allege that Synchrony underwrote Walmart's PLCC program in a way that irresponsibly exposed it to significant credit risk and harmed Walmart. Walmart's complaint cites Keane's statement in July 2018 that the Walmart portfolio "was somewhat unique in terms of the profile" and that renewal talks with Walmart failed because Synchrony "[wasn't] able to earn a return that was in line with the credit risk of the portfolio," even though Synchrony was "earning an acceptable return for that risk" under their previous agreement. App'x at 609-10 (alterations omitted). However, most of the

14

complaint is redacted, so the full theory of the case and the grounds for the complaint are unclear from the public version of the document. After Walmart filed its lawsuit, Synchrony's share price dropped another 10 percent.

Based on the above events, Stichting brought claims under Section 10(b) of the Exchange Act and Rule 10b-5 of Securities and Exchange Commission ("SEC") regulations against the Exchange Act defendants and Sections 20A and 20(a) of the Exchange Act against Keane, Doubles, and Quindlen. In addition to the officers' oral statements, Stichting alleges material misrepresentations in registration documents submitted to the SEC in 2016 and 2017 in connection with the Offering. Stichting cites Synchrony's assertions in its 2016 Form 10-K that it "benefits from longstanding and collaborative relationships with . . . partners, including some of the nation's leading retailers and manufacturers," and its practices "align[] [Synchrony's] interests with those of [its] partners." App'x at 128. Synchrony also stated that it had "stable asset quality," that the "credit environment remained favorable during 2016," that it did not anticipate making "significant changes" to its underwriting standards, and net charge-off rates remained "relatively stable." App'x at 129. These written statements underlie Synchrony's Securities Act claims, brought under Sections 11 and 15.

15

**III.    Proceedings in District Court**

The district court appointed Stichting as lead plaintiff in the putative class action on February 5, 2019. *In re Synchrony Fin. Sec. Litig.*, 450 F. Supp. 3d 127, 145 (D. Conn. 2020). The district court consolidated the instant action with two shareholder derivative actions, but later granted a motion by derivative plaintiffs to separate the cases. *Id.* Stichting then filed an amended complaint. Defendants moved to dismiss the amended complaint pursuant to Federal Rules 9 and 12(b)(6). While the motion to dismiss was pending, Stichting filed a motion for a partial modification of the discovery stay on the case, pursuant to the PSLRA. The district court issued a ruling and order dismissing the case in its entirety and a text order dismissing the motion to modify the PSLRA discovery stay as moot.

In its ruling and order on the motion to dismiss, the district court divided the allegations into statements made before and after April 28, 2017, the date when Synchrony first began disclosing disappointing returns resulting from its poorly performing credit portfolio. The district court explained that phrases like "stable asset quality," "relatively stable" net charge-off rates, and "disciplined" underwriting were not material misstatements that an investor could reasonably have relied upon when the total mix of public information disclosed

16

contextualizing details about the underwriting changes. *Id.* at 152. According to the district court, sufficient cautionary language existed elsewhere in the disclosures to make these purported "omissions" or "misstatements" immaterial. *Id.* at 153. Moreover, on earnings calls, Synchrony officers repeatedly mentioned that Synchrony was "always making tweaks and refinements" to their underwriting standards, sufficiently contextualizing other adjectives like "consistent" or "disciplined." *Id.* (internal quotation marks omitted). In any event, according to the district court, many of the cited phrases and adjectives constituted nothing more than inactionable puffery or opinion. *Id.* at 154.

The district court also explained that disclosures or admissions made after April 28, 2017 could not constitute evidence of earlier alleged misrepresentations because plaintiffs may not "proceed with allegations of fraud by hindsight." *Id.* at 152 (internal quotation marks omitted). Stichting "must do more than allege that Defendants could not have actually believed that loan loss reserves were adequate because they later increased reserves." *Id.* at 153 (internal quotation marks omitted).

As for comments regarding Synchrony's relationships with retail partners, the district court concluded that all of them were not more than "vague

17

statements of optimism or expressions of opinion." *Id.* at 155-56 (internal quotation marks omitted). Because they were too general to create a duty to disclose or further update investors on the state of renegotiations with Walmart and other partners, Synchrony did not violate any duties by failing to explicitly warn investors that it was at risk of losing their Walmart contract. *Id.* at 156. The district court construed Stichting's allegations on this matter as not more than alleging "lack of clairvoyance" as to the uncertain state of the Walmart contract renewal. *Id.* (internal quotation marks omitted). In doing so, the district court made no reference to the statements from the former employees or the WSJ articles set out in the amended complaint.

The district court next disposed of the statements that Synchrony's interests were "completely aligned" with those of its retail partners as too vague to constitute a material misrepresentation when viewed with the total mix of public information, which admitted the consumer finance industry was competitive. *Id.* (internal quotation marks omitted). The district court also relied on portions of Walmart's complaint against Synchrony to debunk Stichting's theory that Walmart was unhappy with Synchrony for tightened underwriting standards; instead, it seemed that Walmart sued Synchrony for being too lax

with its underwriting practices. *Id.* at 157. Because the district court dismissed the purported misrepresentations on generality grounds, it did not reach the questions of scienter and loss causation. *Id.* The district court then dismissed Stichting's Section 20A and 20(a) claims as dependent on plausibly alleging violations of Section 10(b) of the Exchange Act. *Id.* at 158.

Next, the district court turned to the Securities Act claims. Focusing on only the purported misstatements made in the Offering materials, the district court concluded that the "touting" of a "partner-centric model" was at best inactionable corporate puffery. *Id.* at 160 (internal quotation marks omitted). It also concluded the Section 11 Securities Act claims were time-barred, as Synchrony began disclosing its problems on April 28, 2017 and Stichting filed its amended complaint filed on April 5, 2019—too late for Section 11's one-year statute of limitations. *Id.* The district court dismissed the Section 15 claim because a plausibly alleged Section 11 claim was a prerequisite. *Id.* at 161. The district court also denied leave to amend, concluding that amendment would be futile. *Id.* at 161-62. Stichting filed a timely notice of appeal.

**DISCUSSION**

We review a district court's grant of a motion to dismiss de novo, *Hernandez v. United States*, 939 F.3d 191, 198 (2d Cir. 2019), and denials of leave to amend for abuse of discretion, *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Hernandez*, 939 F.3d at 198 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). For complaints alleging securities fraud, we apply heightened pleading requirements imposed by Federal Rule 9(b) and the PSLRA. Federal Rule 9(b) "requires that averments of fraud be stated with particularity." *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 108 (2d Cir. 2012) (alteration and internal quotation marks omitted) (quoting Fed. R. Civ. P. 9(b)). To do so, a plaintiff must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id.* (internal quotation marks omitted). The PSLRA requires plaintiffs to "specify each misleading statement; . . . set forth the facts on which a belief that a statement is misleading was formed; and . . . state with particularity facts giving rise to a strong inference that

20

the defendant acted with the required state of mind." *Id.* (alteration and internal quotation marks omitted).

**I. Exchange Act Claims**

Section 10-b of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device . . . in contravention of [SEC] rules and regulations." 15 U.S.C. § 78j. SEC Rule 10b-5, in turn, declares it unlawful

> for any person, directly or indirectly . . . :
> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. "To state a claim for securities fraud under these provisions a plaintiff must allege that each defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100 (2d Cir. 2015) (internal quotation marks omitted).

"Silence, absent a duty to disclose, is not misleading under Rule 10b-5." *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988). As a result, we have held that "an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts." *Stratte-McClure*, 776 F.3d at 101 (internal quotation marks omitted). This duty may arise when "a corporate insider trad[es] on confidential information, a statute or regulation requir[es] disclosure," or a statement is made that would be "inaccurate, incomplete, or misleading" without further context. *Id.* (alteration and internal quotation marks omitted). "Statement[s]" include assertions in public filings, such as Form 10-K reports. *See id.*

A corporation's expressions of optimism about negotiations, without "definite positive projections," do not create a duty to disclose all aspects of the negotiation to investors. *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993). In other words, "there is no duty to update vague statements of optimism or expressions of opinion." *In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163 F.3d 102, 110 (2d Cir. 1998).

## A. The Pushback Statement

Stichting's Exchange Act claim rests in part on Synchrony CEO Keane's statements during a January 19, 2018 earnings call. During that call, Synchrony CFO Doubles and an analyst discussed how tightened underwriting had "materialized first in [Synchrony's] sales" to consumers, leading the analyst to inquire whether retail partners voiced "any pushback" to Synchrony's tightened underwriting practices, particularly as to subprime borrowers. App'x at 84 (alteration and internal quotation marks omitted). Keane responded that Synchrony's partners were "very cognizant" of the problem of putting too much credit in the hands of subprime borrowers and, importantly, stated that Synchrony was "not getting any pushback on credit." App'x at 84.

We start by defining "pushback," using the most straightforward option: common dictionary usage. Pushback refers to "resistance or opposition in response to a policy or regulation especially by those affected." MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/pushback (last visited Feb. 12, 2021). It is also a "negative reaction to a change or to something new that has been introduced." CAMBRIDGE DICTIONARY,

23

https://dictionary.cambridge.org/us/dictionary/english/pushback (last visited

Feb. 12, 2021). Given this definition, we interpret Keane's statement to mean that,

by January 19, 2018, Synchrony had not received any negative reactions or

opposition from retail partners to changes in its underwriting practices.

Unlike the other alleged misrepresentations, this statement was specific

enough to survive the pleadings stage. Keane's assertion about pushback was not

a "vague expression[] of opinion," *In re IBM*, 163 F.3d at 110, that "talks with

multiple partners . . . would go well," *In re Time Warner*, 9 F.3d at 267. Instead, it

was a "concrete" description and a "factual representation," *In re IBM*, 163 F.3d

at 110, that purported to describe the state of Synchrony's business relationships

as of January 19, 2018. We disagree with the district court that a general

disclosure about the competitive nature of the consumer finance market properly

contextualizes this statement. *See In re Synchrony*, 450 F. Supp. 3d at 156.

Although this disclosure may have warned reasonable investors of the general

possibility of losing contracts to competitive firms, it does not cure the alleged

falsity of Keane's narrower assertion—that Synchrony had not received any

negative feedback from its retail partners regarding its underwriting changes by

January 2018.

24

Moreover, several allegations within the amended complaint specifically allege that Synchrony and its representatives knew the statement was false when made, at least with respect to Walmart. For example, Stichting includes statements from former employees who were personally involved with the Walmart account and attended meetings with Walmart representatives, claiming that Walmart had expressed frustration with Synchrony's underwriting practices in 2017. One former employee allegedly observed that Keane and Doubles traveled to Arkansas with increased frequency during the latter half of 2017 and into early 2018 to mitigate the impact of "alarming feedback from the Walmart client relationship manager that the relationship was doomed." App'x at 61. The two WSJ articles cited in the complaint also collectively reported that Walmart "balked" at the idea of renewal in fall 2017 and that, for the first time in the history of the Walmart-Synchrony relationship, Walmart began soliciting bids from other credit card issuers by late 2017. App'x at 62-63. Former employees corroborated this, explaining that it was well known within Synchrony that Walmart had solicited bids from at least one of Synchrony's competitors. The district court largely failed to address the specificity of these allegations and how they directly undermined Keane's January 2018 statement. Indeed, taken

25

together, these particularized allegations plausibly allege that Keane's assertion that Synchrony had received no "resistance or opposition," MERRIAM-WEBSTER.COM DICTIONARY, or "negative reaction," CAMBRIDGE DICTIONARY, to its underwriting policy changes was a misleading statement.

It is true that securities fraud plaintiffs must allege "the circumstances constituting fraud . . . with particularity." *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000) (internal quotation marks omitted). But rather than rest on "conclusory or unsupported" allegations of fraud, *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007), Stichting provided numerous allegations in its amended complaint that "explain why the statement[ was] fraudulent," *Novak*, 216 F.3d at 306 (internal quotation marks omitted). Stichting alleged that Synchrony and its representatives "did more than just offer rosy predictions" and instead represented that no retail partner had provided any negative commentary on Synchrony's underwriting practices "while they allegedly knew that the contrary was true." *Id.* at 315. The anonymity of the former employees corroborating Stichting's allegations does not defeat the plausibility of the allegations because "there is nothing in the caselaw of this circuit that requires plaintiffs to reveal confidential sources at the pleading stage." *Id.* at 313. Whether

26

these former employees will prove to be credible and percipient sources is not at issue at this stage of the litigation. And we have previously explained that financial publications, such as the WSJ, which also corroborated Stichting's alleged timeline of events, play an important role in informing investors about public corporations. *See In re Time Warner Inc.*, 9 F.3d at 265 (explaining that "the function of financial reporters . . . is to determine the truth about the affairs of publicly traded companies"). Although we are aware of the importance of deterring "securities fraud claims of dubious merit in order to exact large settlement recoveries," *Novak*, 216 F.3d at 306, Stichting's detailed narrative about the Walmart relationship eases our concerns.

The district court referred to parts of Walmart's complaint in support of its dismissal, reasoning the "allegations thus suggest that Walmart's non-renewal was due to Defendants' too-loose underwriting, and not stricter or tightened underwriting, as the Lead Plaintiffs allege." *In re Synchrony*, 450 F. Supp. 3d at 157. Stichting argues that Synchrony improperly uses the Walmart complaint both as a sword and a shield—holding out the public portions of the complaint to defeat Stichting's theory regarding Walmart's relationship while refusing to reveal the sealed portions of the complaint. We express no opinion on the sword-

and-shield argument but agree that the redacted complaint does not illuminate the precise nature of Walmart's legal dispute with Synchrony or the myriad factors that could have damaged Walmart's relationship with Synchrony in late 2017. While some public paragraphs reference the laxity of Synchrony's underwriting practices, it is unclear whether that issue exclusively underlies the conflict given that most of the complaint remains sealed. It is also plausible that Synchrony's previously too-lax underwriting strategy breached its pre-existing agreement with Walmart *and* that Synchrony subsequently overcorrected its underwriting practices, disproportionately cutting into Walmart's PLCC profits and reducing the prospect of renewal. Although lax underwriting strategies may have generated higher credit risk, this is not mutually exclusive with the possibility that Walmart pushed back on tighter underwriting practices that cut into profits and revenue from its customer base. Indeed, that is Stichting's theory, one that we are obligated to credit at this stage. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 68 (2d Cir. 2001).

Appellees argue that we may alternatively dismiss any surviving allegations for failure to raise a strong inference of scienter. The district court did not reach the questions of scienter or loss causation. *See In re Synchrony*, 450 F.

Supp. 3d at 157. And despite concluding that none of the alleged misstatements was material, the district court's opinion also did not fully grapple with the question of whether Keane's January 2018 statement about pushback—if assumed false—was something "a reasonable investor would have considered significant in making investment decisions." *Ganino*, 228 F.3d at 161; *see In re Synchrony*, 450 F. Supp. 3d at 157. We see no need to reach these unaddressed issues. *See S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1466 (2d Cir. 1996) ("The materiality of an item of information is a mixed question of law and fact.").

## B.  Other Exchange Act Allegations

On the other hand, we agree with the district court that the remaining allegations cannot support Synchrony's Exchange Act claims. They fail for two main reasons: first, some alleged misrepresentations are too vague or forward-looking to be more than corporate puffery; second, the alleged misrepresentations were properly contextualized when viewed with the total mix of publicly disclosed information.

Stichting relies on statements that the company was "pretty confident" and "pretty positive" about the prospect of renewing partnerships in 2019, but these are best characterized as inactionable corporate puffery. App'x at 66.

29

"[E]xpressions of puffery and corporate optimism do not give rise to securities violations. Up to a point, companies must be permitted to operate with a hopeful outlook[.]" *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) (citation omitted). Unlike the specific, factual nature of the pushback statement, these vague descriptions offer only generally optimistic opinions. The same analysis applies to Synchrony's written language in its Form 10-K, which includes headings like "stable asset quality" and assertions that Synchrony's "partner-centric business model has been successful because it aligns [its] interests with those of [its] partners." App'x at 128-29. Synchrony was permitted "to be confident about" its business model at this level of generality without risking liability. *Rombach*, 355 F.3d at 174. Vague positive statements regarding a corporate entity's risk management strategy, asset quality, and business practices are "too general to cause a reasonable investor to rely upon them" and therefore are "precisely the type of puffery that this and other circuits have consistently held to be inactionable." *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009) (internal quotation marks omitted).

Stichting also argues that Synchrony and its representatives materially misrepresented the scope of changes in its underwriting standards by claiming

30

that Synchrony maintained "consistency" in its underwriting. App'x at 75. We agree with the district court that this and other similar statements did not materially mislead investors, given the context provided by the rest of the disclosures. "For an undisclosed fact to be material, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 180 (2d Cir. 2001) (internal quotation marks omitted). "The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010) (internal quotation marks omitted). Furthermore, even at the motion to dismiss stage, courts "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents . . . , and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI*, 493 F.3d at 98. Therefore, Stichting may not cherry pick certain public statements for its complaint and divorce them from the universe of disclosed information to plausibly allege fraud.

31

Although Synchrony representatives opined that its underwriting standards were stable and consistent, they also materially informed reasonable investors of a tightening credit market and of the scope of the changes Synchrony would have to make to accommodate it. For example, as early as March 2015, Keane explained that credit losses were at an "all-time low" but that they would likely "change at some point." App'x at 506. Doubles stated in December 2016 that Synchrony maintained "consistency" in its underwriting as to consumers with FICO scores between 600 and 625 and that Synchrony "not seeing anything right now that tells [it] to change [its] underwriting," but he also said within that very statement that Synchrony was "always making tweaks and refinements and modifying the model a little bit." App'x at 75. In early 2017, Doubles also clarified that Synchrony's underwriting depended on "different loss rates" in its "portfolio mix," while continuing to maintain that, overall, Synchrony's underwriting had not changed "significantly over the past 9 to 12 months." App'x at 75-77. Without more, words like "consistency" and "significantly" do not provide metrics on which a reasonable investor would rely. Furthermore, Synchrony did disclose additional details of its underwriting practices, including a breakdown of its portfolio composition by FICO score. That breakdown

informs investors that the percentage of subprime borrowers within Synchrony's loan portfolio decreased between 2008 and 2016.

Additionally, in its June 14, 2016 Form 8-K, Synchrony explained that its credit loss rate was "at historically low levels" and it therefore expected a "20-30 basis point increase in [its] net charge-off rates . . . over the next 12 months." App'x at 184. On April 28, 2017, Synchrony discussed its quarterly performance and disclosed increased net charge-off rates and loan loss allowances. But, as Doubles stated on the call, Synchrony representatives had "noted previously" that the credit market would inevitably normalize after a remarkably robust period, resulting in increased loan losses after an all-time low. App'x at 310.

Contrary to Stichting's argument, these disclosures are more than "[a] generic warning of a risk." *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 251 (2d Cir. 2014). A comprehensive reading of Synchrony's public disclosures would reveal to a reasonable investor that Synchrony expected increased loan losses and constantly modified its underwriting model. Synchrony also timely revealed the nature and scope of the underwriting changes it made in response

33

to a changing credit market.[2] That certain former employees believed the 2016 underwriting changes were more significant than previous modifications does not change this outcome. Unlike the binary nature of the "pushback" statement, the scope of underwriting changes falls along a spectrum. Synchrony executives opined that the changes were not wholesale deviations from previous norms, but investors were given the warning signs and numerical metrics they needed to determine whether they agreed and whether that affected investing decisions. Therefore, the statements regarding changes to Synchrony's underwriting practices cannot be categorized as material misrepresentations.

Other statements such as "the credit environment remained favorable during 2016" and that Synchrony "[did] not anticipate making significant

---

[2] The district court distinguished between alleged misrepresentations made before and after April 28, 2017, the date Synchrony first disclosed a disappointing financial performance, reasoning that Stichting "may not use Synchrony's disclosures or admissions on or after April 28, 2017, as evidence of earlier alleged misrepresentations, because they cannot proceed with allegations of fraud by hindsight." *In re Synchrony*, 450 F. Supp. 3d at 152 (internal quotation marks omitted). We take no position on this analysis of the timeline but simply conclude that none of the cited statements—whether issued before or after April 28, 2017—are specific enough to constitute material misrepresentations about Synchrony's underwriting practices when viewed with the total mix of public information.

34

changes to [its] underwriting standards," App'x at 129, also fail to support Exchange Act violations. "[F]orward-looking statements regarding [future returns] . . . , adequately tinged with caution . . . cannot reasonably be found to be misleading." *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 811 (2d Cir. 1996). Additionally, "[e]conomic prognostication, though faulty, does not, without more, amount to fraud." *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 117 (2d Cir. 1982) (alteration and internal quotation marks omitted). Synchrony appropriately qualified its optimism about the economy and its own operations, warning that the current period was a particularly robust credit market and that Synchrony expected to increase its loan loss reserves in the face of foreseeably greater net charge-off rates.

Notwithstanding the above, whether Synchrony's retail partners pushed back on underwriting changes due to their profit and incentives is a separate issue, one that Stichting plausibly pled in support of its Exchange Act claims. Accordingly, we reverse the dismissal insofar as Stichting's Exchange Act claims are premised on Keane's statement about "pushback," and affirm the dismissal of the other Exchange Act claims.

35

**II.     Securities Act Claims**

We also agree with the district court's dismissal of the Securities Act claims. The Securities Act sections at issue pertain to written statements disclosed in public filings with the SEC. *See* 15 U.S.C. § 77k (explaining that liability may exist for "an untrue statement of a material fact or [an omission of] a material fact" "[i]n . . . any part of [a] registration statement"). As an initial matter, the statute has been held to impose "absolute" liability—as opposed to requiring any particular state of mind or scienter—as long as a plaintiff "establishes one of the three bases for liability under these provisions—(1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715-16 (2d Cir. 2011) (internal quotation marks omitted). However, where the allegations underlying Securities Act claims are premised on fraud, the heightened pleading standard of Federal Rule 9(b) applies. *Rombach*, 355 F.3d at 171. The question is whether a plaintiff's allegations "are classically associated with fraud." *Id.* at 172. The district court concluded that plaintiffs' allegations did sound in fraud, and Stichting did not raise a

36

challenge to that finding in its opening brief on appeal. *In re Synchrony*, 450 F. Supp. 3d at 159. Therefore, we apply the heightened pleading standard.

We agree with the district court that Stichting did not plausibly allege a Section 11 claim because none of its cited statements qualify as actionable material misrepresentations or omissions. Stichting points to the following passage from Synchrony's Offering materials:

> Our business benefits from longstanding and collaborative relationships with our partners, including some of the nation's leading retailers and manufacturers with well-known consumer brands, such as Lowe's, Walmart, Amazon, and Ashley Furniture HomeStore. We believe our partner-centric business model has been successful because it aligns our interests with those of our partners and provides substantial value to both our partners and our customers. Our partners promote our credit products because they generate increased sales and strengthen customer loyalty.

App'x at 127-28.[3]

---

[3] Stichting also recycles statements it cited in support of its Exchange Act claim such as the heading "stable asset quality," and the assertions that the "credit environment remained favorable during 2016," Synchrony "follow[s] a series of credit risk and underwriting procedures," and Synchrony "[did] not anticipate making significant changes to [its] underwriting standards." App'x at 129. We affirm the dismissal of these allegations as to the Securities Act claim for the same reasons discussed in the Exchange Act section. *See supra*.

These statements are too vague to give rise to a Section 11 claim. As discussed above, a generally optimistic view of the state of business partnerships and the synergies of Synchrony's business model cannot support claims of securities fraud. "People in charge of an enterprise are not required to take a gloomy, fearful, or defeatist view. . . ; they can be expected to be confident about their stewardship and the prospects of the business that they manage." *Rombach*, 355 F.3d at 174 (internal quotation marks omitted). Unlike the specificity of the "pushback" statement, which related to a precise moment in time and a particular detail about Synchrony's business relationships, these generic statements about Synchrony's overall business model do not "invite reasonable reliance." *Singh v. Cigna Corp.*, 918 F.3d 57, 60, 61, 63 (2d Cir. 2019) (explaining that a corporation's statement that it had "established policies and procedures to comply" with applicable regulations was corporate puffery (internal quotation marks omitted)). They are simply too generic to express any objective fact. Moreover, Synchrony tempered its general optimism by also acknowledging that "[c]ompetition in the consumer finance industry is intense," App'x at 415, and explaining that it expected the credit market to tighten, as discussed above. Therefore, Synchrony disclosed the "known trend[s], event[s], or uncertaint[ies]"

38

that were "reasonably expected to materially affect [its business operations]," *Litwin*, 634 F.3d at 718-19, satisfying its obligations under the Securities Act.

Because we dismiss the Securities Act claims on the merits, we do not reach the district court's alternative holding that they were untimely. *See In re Synchrony*, 450 F. Supp. 3d at 160. We also affirm the district court's dismissal of the dependent Section 15 Securities Act claim. *See id.* at 161; *see also Rombach*, 355 F.3d at 177-78 (explaining that Section 15 liability is "necessarily predicated on a primary violation of securities law").

**III.     The Motion to Modify the PSLRA Discovery Stay and Leave to Amend**

Although the parties briefed the issue, we take no position on Stichting's motion for a partial modification of the PSLRA discovery stay, which Stichting is free to raise again in due course. Similarly, we express no opinion on whether the district court exceeded the bounds of its discretion by denying leave to amend. Because our opinion partially reinstates Stichting's amended complaint, we leave it in the very capable hands of the district court to manage the remainder of the litigation.

39

**CONCLUSION**

Although we agree with most of the district court's well-reasoned ruling, the fraud allegations premised on the statement about "pushback" from retail partners were stated with sufficient particularity to survive a motion to dismiss. Accordingly, we reinstate only the portion of the Exchange Act claims related to those allegations and otherwise affirm the dismissal of the other Exchange Act and Securities Act claims. We have considered Stichting's remaining arguments and find them to be without merit. Accordingly, the district court's ruling is **AFFIRMED** in part and **REVERSED** in part, and we **REMAND** for further proceedings in accordance with this opinion.